## VAN DYKE et al. v. GEARY et al.

(District Court, D. Arizona. August 12, 1914.)

1. COURTS (§ 366*)—JURISDICTION OF FEDERAL COURTS—CONSTITUTIONALITY OF STATE STATUTE.

    Where the constitutionality of a state statute, under the Constitution of the United States, has not been passed upon by the highest court of the state, it is the right and duty of a federal court, whose jurisdiction is properly invoked, to determine the question in the exercise of its independent judgment.

    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*]

2. CONSTITUTIONAL LAW (§§ 247, 303*)—CORPORATIONS (§ 394*)—EQUAL PROTECTION OF LAWS—DUE PROCESS OF LAW—EXCESSIVE PENALTIES.

    Laws Ariz. 1912, c. 90 (Civ. Code Ariz. 1913, pars. 2277–2360), creating a state corporation commission and defining its powers, which provides that its orders shall not be suspended by any court during a judicial review thereof, and imposes such enormous penalties in the way of cumulative fines and imprisonment upon any public service corporation, its officers

or employés, for failure to obey any such order, as to practically deprive such a corporation of the right to appeal to the courts to determine the validity of any order, is unconstitutional and void as to such provisions, as depriving a corporation or individual against whom an order is made of the equal protection of the laws, and the corporation of its property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 703, 863–866; Dec. Dig. §§ 247, 303;* Corporations, Cent. Dig. § 1576; Dec. Dig. § 394.*]

3. WATERS AND WATER COURSES (§ 203*)—STATE REGULATION OF RATES—REVIEW OF ORDERS.

That the owner of a water system did not produce any evidence as to the value of the property before a state commission, which subsequently made an order fixing rates to be charged to customers of such system, does not estop him to deny the fairness of the valuation made by the commission, or to claim that the rates made are confiscatory.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 289, 290–299; Dec. Dig. § 203.*]

4. WATERS AND WATER COURSES (§ 203*)—WATERWORKS—STATE REGULATION OF RATES—REASONABLENESS OF RATES.

Evidence considered, and *held* insufficient to show that a state commission, in fixing the value of a water system, omitted any element of substantial value, or that water rates fixed by the commission were so low as to be confiscatory.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 289, 290–299; Dec. Dig. § 203.*]

5. WATERS AND WATER COURSES (§ 182*)—WATERWORKS SYSTEM—STATE REGULATION—CONSTRUCTION AND VALIDITY OF STATUTE—"WATER CORPORATION"—"PUBLIC SERVICE CORPORATION."

Const. Ariz. art. 15, §§ 2, 3, provide that all corporations, other than municipal, furnishing water for public purposes, shall be deemed "public service corporations," and shall be subject to regulation as to rates, etc., by a state corporation commission. The Public Service Corporation Act of Arizona (Civ. Code 1913, pars. 2277–2360), which defines the powers and duties of the corporation Commission, provides that "the term 'water corporation,' when used in this act, includes every corporation or person * * * owning, * * * operating, or managing any water system for compensation within this state." *Held*, that such provision, as applied to an individual owning and operating such a system, is not in conflict with the state Constitution, and that under the act the corporation commission has power to regulate charges to be made for water furnished by such system.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 267; Dec. Dig. § 182.*

For other definitions, see Words and Phrases, Second Series, Public Service Corporation.]

6. STATUTES (§ 113*)—SUBJECTS AND TITLES OF ACTS—CONSTITUTIONAL REQUIREMENTS.

The Public Service Corporation Act of Arizona (Civ. Code 1913, pars. 2277–2360), which confers power on the corporation commission to regulate rates to be charged for water furnished by any system, whether owned by a corporation or an individual, is not void as to such provision, under Const. Ariz. art. 4, pt. 2, § 13, providing that every act shall embrace but one subject "and matters properly connected therewith," which subject shall be expressed in the title, because no reference is made in the title of the act to the regulation of individual business.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 141–144; Dec. Dig. § 113.*]

7. WATERS AND WATER COURSES (§ 202*)—WATER COMPANIES—STATE REGULATION.

A state commission *held* without power to order the owner of a water system, constructed and operated only to supply residents on certain lands, to connect such system with other consumers and furnish them with water, where there was no evidence to warrant a finding that the supply of water was more than required to properly serve the consumers for whom it was intended.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 276; Dec. Dig. § 202.*]

In Equity. Suit by Ida A. Van Dyke and Cleve W. Van Dyke against W. Paul Geary, Amos W. Cole, and Frank A. Jones, members of the Corporation Commission of the State of Arizona, the Corporation Commission, and George P. Bullard, Attorney General of the State of Arizona, and Norman J. Johnson, County Attorney of Gila County, State of Arizona. On motion for preliminary injunction. Granted in part.

George J. Stoneman and Reese M. Ling, both of Phœnix, Ariz., and F. C. Jacobs, of Globe, Ariz., for complainants.

G. P. Bullard, Atty. Gen., for defendants.

Before MORROW, Circuit Judge, and DOOLING and SAWTELLE, District Judges, convened under the provisions of section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [Comp. St. 1913, § 1243]).

SAWTELLE, District Judge. This is an application for an interlocutory injunction, made in pursuance of section 266 of the Judicial Code. Complainants and defendants, and each and all of them, are citizens of the state of Arizona, and this suit is one arising under the Constitution and laws of the United States, other than those requiring diversity of citizenship for federal jurisdiction.

The Arizona corporation commission is a legally constituted board of the state of Arizona, exercising quasi judicial, legislative, and ministerial functions; the defendants Geary, Cole, and Jones are the duly qualified members of said corporation commission; the defendant George P. Bullard is the Attorney General of the state of Arizona; and the defendant Norman J. Johnson is the county attorney of Gila county, Ariz., that being the county wherein is situated the water system and other property in controversy herein.

The complainants, at the town of Miami, Gila county, Ariz., have installed and are operating in the individual name of said Ida A. Van Dyke a water system for the purpose of selling and delivering water for domestic and commercial use and for fire protection in the said town of Miami. Said Ida A. Van Dyke is the sole owner of said water system, which, as is shown by the record herein, was established for the sole purpose of supplying the purchasers of land of the Miami Townsite Company, a corporation owned by said Ida A. Van Dyke and her husband, Cleve W. Van Dyke, with water, and not for the purpose of supplying the public generally with water.

On October 17, 1913, said Arizona corporation commission, upon its own motion, complained of said Ida A. Van Dyke and Cleve W. Van Dyke, alleging that they were doing business as a public service corporation in distributing, delivering, and selling water for domestic and commercial use and for fire protection in said town of Miami, that the rates and charges for such water were excessive, unreasonable, and unjust, and "that the services and classes of service rendered by said respondents (complainants herein) to consumers of water in the town of Miami are inadequate, unsatisfactory, and uncertain." Said complaint concluded with the prayer that such rates be deemed excessive, unreasonable, and unjust, etc., and was signed by said Geary and Cole, respectively, commissioners as aforesaid.

Said respondents were cited to appear before said corporation commission and make answer to said complaint. In response thereto they did appear before said corporation commission and interposed a verified plea in bar, denying the right, authority, and jurisdiction of the said commission to assert, or attempt to assert, any right, power, authority, or jurisdiction over said respondents, or either of them, upon the grounds, among others, that they are not, and neither of them are, the owners of a water corporation situated in the town of Miami engaged in doing business as a public service corporation in distributing, delivering, and selling water for domestic and commercial use and for fire protection in said town of Miami, and are not acting as a corporation under the laws of the state of Arizona, or any other state, or at all; that the said Ida A. Van Dyke is the sole owner of the said water system in said town of Miami, and the water sold and distributed was and is distributed by her as an individual and as a natural person; that the said Arizona corporation commission is without power or jurisdiction to investigate or control the business so owned by the said Ida A. Van Dyke personally, which said plea in bar was by said Arizona corporation commission overruled and denied.

Thereafter, pursuant to notice duly given, said Arizona corporation commission proceeded to conduct a hearing based upon the complaint theretofore filed, at which hearing respondents were represented by counsel, and subsequently, on, to wit, the 1st day of May, 1914, made and entered an order:

"(1) That the respondents constitute a water corporation, owning, controlling, operating, and managing a water system for compensation in the town of Miami, state of Arizona, and are doing business as a public service corporation in distributing, delivering, and selling water for domestic, commercial, and fire uses in said town.

"(2) That present and existing rates and charges, and each of them, made, maintained, and collected by said respondents, are unjust, unreasonable, and excessive"

—and fixing and prescribing rates to be charged and collected by the owner of said water system and by Cleve W. Van Dyke, the manager thereof. The said Arizona corporation commission, after hearing all the evidence, found that said Ida A. Van Dyke was the sole owner of said water system. To quote from the opinion handed down by said commission:

"Some considerable discussion has ensued relative to the ownership of the plant. The weight of all testimony apparently shows that I. A. Van Dyke is the sole owner thereof, and is doing business as a public service corporation in distributing, delivering, and selling water for domestic, commercial, and fire use in the town of Miami."

In due course said Ida A. Van Dyke and Cleve W. Van Dyke filed with said Arizona corporation commission a motion for a rehearing of the said order, which motion was by said Arizona corporation commission denied. Thereafter they filed their motion, praying for a suspension of the operation of the said order for a period of 60 days from the date the same became operative, alleging that it was their intention to apply to the state courts for a review of said order, and further alleging that, unless said order was suspended by said commission, they would, "pending the determination of the issues raised in the motion for a rehearing, be subject to a fine of not exceeding $5,000 per day, or to imprisonment for each day during which the petition for a review of said order shall be pending and undisposed of," which motion was by said Arizona corporation commission denied.

On or about the 23d day of July, 1914, and while this case was pending in this court, said corporation commission, after a hearing had before it, made and entered an order by the terms of which said Ida A. Van Dyke was required—

"immediately to construct a water main of necessary size, with proper valves and fittings, and connect her water system in the town of Miami with the consumers of the Live Oak addition to said town, and that she serve all consumers in said Live Oak addition with water, charging the same rate and under the same rules as are in force in said town of Miami, and that this order be carried into effect within ten (10) days from the date hereof."

It is claimed that said Live Oak addition is no part of the town of Miami, that said water system was equipped and is maintained for the sole and only purpose of supplying purchasers of town lots in said town of Miami with water, and that the quantity thereof was barely sufficient for the needs of the owners and purchasers of lots in Miami townsite.

The complainants herein have filed this bill to enjoin the enforcement of the said orders of said corporation commission.

1. The jurisdiction of this court is primarily invoked on the ground that chapter 90 of the Laws of the First Legislature of the state of Arizona, now embraced in chapter 11, title 9, Revised Statutes of Arizona 1913, is unconstitutional, because the fines and penalties therein prescribed are so severe and cumulative that an enforcement of them would work a forfeiture of complainants' property, and in effect destroy the right of the complainants to appeal to the courts for the purpose of testing either the validity of the law or the reasonableness of any order of the corporation commission; that by this means complainants are denied the equal protection of the law and due process of law, in contravention of their rights under the Constitution of the United States and the Constitution of the state of Arizona.

This is not the first time the jurisdiction of this court has been invoked by reason of the objectionable features of the above statute. The same question was presented in the case of Bonbright et al. v.

Geary et al. (D. C.) 210 Fed. 44, and in that case, in referring to the contention of the complainants that the pains and penalties of the Arizona statutes were so severe and cumulative that the complainants could not under the provisions of the statute test the validity of the order of the corporation commission without the danger of being subject to irreparable damage and absolute ruin, the court, speaking through Judge Morrow, said:

"These allegations of the complaint and the provisions of the Arizona statute to which reference is made appear to bring this case within the decision of the Supreme Court of the United States in Ex parte Young, 209 U. S. 123–144 [28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764]; but, as the jurisdiction of this court is otherwise complete, we will not stop to discuss that feature of the case."

We think it unnecessary to go into a lengthy discussion of this question. We hold that this court has jurisdiction of this cause, because it involves the decision of a federal question arising under the Constitution of the United States.

[1] 2. Let us now consider the above contention that said chapter 90 above referred to is unconstitutional. As above stated, the constitutionality of this act was not considered or passed upon in the case of Bonbright et al. v. Geary et al., supra, for the reason that the jurisdiction of this court was otherwise complete. It is admitted that the constitutionality of this act has not been passed upon by the Supreme Court of the state of Arizona, and that there is not now pending in said court any case involving this question. That being so, this court must hear and determine, not only the question which concerns the jurisdiction of this court, but also every other question herein involved. As was said by the Supreme Court of the United States in the case of Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359:

"When the transactions in controversy occurred, and when the case was under the consideration of the Circuit Court, no construction of the statute had been given by the state tribunals contrary to that given by the Circuit Court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established, which become rules of property and action in the state, and have all the effects of law, and which it would be wrong to disturb. * * * Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they * * * always do in reference to the doctrines of commercial law and general jurisprudence."

See, also, Foster's Federal Practice, vol. 2 (4th Ed.) p. 1266, and a long list of cases there cited.

[2] In considering this question it should be borne in mind that the complainants in due time and in good faith filed with said corporation commission their petition for a rehearing on said order so entered by said corporation commission, which was denied. Subsequently

they filed their petition for a suspension of said order, to enable them to resort to the state courts for the purpose of determining the validity and reasonableness of said order. This petition was also denied. The said Act 90 contains the following provisions:

Section 66: "After any order or decision has been made by the commission, any party to the action or proceeding, or any stockholder, or bondholder, or other party pecuniarily interested in the public service corporation affected, or the Attorney General on behalf of the state, may apply for a rehearing in respect to any matters determined in said action or proceeding and specified in the application for rehearing, and the commission may grant and hold such rehearing on said matters, if in its judgment sufficient reason therefor be made to appear. No cause of action arising out of any order or decision of the commission shall accrue in any court to any corporation or person, or the state, unless such corporation or person, or the state, shall have made, before the effective date of said order or decision, application to the commission for a rehearing.

"Such application shall set forth specifically the ground or grounds on which the applicant considers said decision or order to be unlawful. No corporation or person, or the state, shall in any court urge or rely on any ground not set forth in said application. Any application for a rehearing made ten days or more before the effective date of the order as to which a rehearing is sought, shall be either granted or denied before such effective date, or the order shall stand suspended until such application is granted or denied. Any application for a rehearing made within less than ten days before the effective date of the order as to which a rehearing is sought, and not granted within twenty days, may be taken by the party making the application to be denied, unless the effective date of the order is extended for a period of the pendency of the application. If any application for a rehearing be granted without a suspension of the order involved, the commission shall forthwith proceed to hear the matter with all despatch and shall determine the same within twenty days after final submission, and if such determination is not made within said time, it may be taken by any party to the rehearing that the order involved is affirmed. An application for rehearing shall not excuse any corporation or person from complying with and obeying any order or decision, or any requirements of any order or decision of the commission theretofore made, or operate in any manner to stay or postpone the enforcement thereof, except in such cases and upon such terms as the commission may by order direct. If, after such rehearing and a consideration of all the facts, including those arising since the making of the order or decision, the commission shall be of the opinion that the original order or decision or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate, change, or modify the same. An order or decision made after such rehearing abrogating, changing, or modifying the original order or decision shall have the same force and effect as an original order or decision, but shall not affect any right or the enforcement of any right arising from or by virtue of the original order or decision unless so ordered by the commission."

Section 76: "(a) Any public service corporation which violates or fails to comply with any provision of the Constitution of this state or of this act, or which fails, omits or neglects to obey, observe or comply with any order, decision, decree, rule, direction, demand or requirement or any part or provision thereof, of the commission, in a case in which a penalty has not hereinbefore been provided for such public service corporation, is subject to a penalty of not less than one hundred dollars nor more than five thousand dollars for each and every offense.

"(b) Every violation of the provisions of this act, or of any order, decision, decree, rule, direction, demand or requirement of the commission, or any part or portion thereof, by any corporation or person is a separate and distinct offense, and in case of a continuing violation each day's continuance thereof shall be and be deemed to be a separate and distinct offense.

"(c) In construing and enforcing the provisions of this act, relating to penalties, the acts, omission or failure of any officer, agent or employé of

any public service corporation, acting within the scope of his official duties or employment, shall in every case be and be deemed to be the act, omission, or failure of such public service corporation."

Section 77: "Every officer, agent or employé of any public service corporation, who violates or fails to comply with, or procures, aids or abets any violation by any public service corporation of any provision of the constitution of this state or of this act, or who fails to obey, observe or comply with any order, decision, rule, direction, demand or requirement or any part or provision thereof, of the commission, or who procures, aids, or abets any public service corporation in its failure to obey, observe and comply with any such order, decision, rule, direction, demand or requirement, or any part or provision thereof in a case in which a penalty has not hereinbefore been provided for such officer, agent or employé, is guilty of a misdemeanor and upon conviction thereof is punishable by a fine not exceeding one thousand dollars, or by imprisonment in a county jail not exceeding one year or both such fine and imprisonment."

Section 81: "In case any public service corporation, corporation or person shall fail to observe, obey or comply with any order, decision, rule, regulation, direction, demand or requirement, or any part or portion thereof, of the commission or any commissioner, such public service corporation, corporation or person shall be in contempt of the commission and shall be fined by the commission a sum not less than one hundred dollars nor more than five thousand dollars, to be recovered before any court of competent jurisdiction, in this state.

"Procedure had in such contempt proceedings shall be the same as in courts of record in this state. The remedy prescribed in this section shall not be a bar to or affect any other remedy prescribed in this act, but shall be cumulative and in addition to any such other remedy or remedies."

Section 74: "(a) This act shall not have the effect to release or waive any right of action by the state, the commission, or any person or corporation for any right, penalty or forfeiture which may have arisen or accrued or may hereafter arise or accrue under any law of this state.

"(b) All penalties accruing under this act shall be cumulative of each other, and a suit for the recovery of one penalty shall not be a bar to or affect the recovery of any other penalty or forfeiture or be a bar to any criminal prosecution against any public service corporation, or any officer, director, agent or employé thereof, or any other corporation or person, or be a bar to the exercise by the commission of its power to punish for contempt."

Section 67: "(h) Upon final hearing the court shall enter judgment affirming, modifying, or setting aside the order or decision of the commission. The provisions of the general laws of this state relating to trials of causes, so far as applicable, and not in conflict with the provisions of this act, shall apply to proceedings instituted in the courts of this state under the provisions of this section. No court of this state shall have jurisdiction to enjoin, restrain, suspend or delay any order or decision of the commission, or to enjoin, restrain or interfere with the commission in the performance of its official duties, and the rules, regulations, orders or decrees fixed by the commission shall remain in force pending the decision of the courts; provided, that the writ of mandamus shall lie from the Supreme Court to the commission in all proper cases.

"Section 68: "All rules, regulations, orders, charges and decrees of the commission shall remain in full force and effect pending a final decision of the court with reference thereto. No order staying, restraining or suspending any order, rule, regulation, charge, or decree of the commission shall be made by any court of this state."

Article 15, § 17, of the Constitution of the state of Arizona, provides as follows:

"Nothing herein shall be construed as denying to public service corporations the right of appeal to the courts of the state from the rules, regulations, orders, or decrees fixed by the corporation commission, but the rules, regulations, orders, or decrees so fixed shall remain in force pending the decision of the courts."

In the Young Case, supra, the Supreme Court of the United States had before it the statutes of the state of Minnesota, the provisions of which are almost identical with Act 90, known as the Arizona Public Service Corporation Act, and in that case the court held that the Minnesota statutes were unconstitutional, without regard to the question of the insufficiency of the rates prescribed. That decision of the Supreme Court is controlling and decisive of the question now before us. In that case it is stated that the railroad and warehouse commission of the State of Minnesota "made an order fixing the rates for the various railroad companies for the carriage of merchandise between stations in that state of the kind and classes specified in what is known as the 'Western Classification,'" which order materially reduced the rates theretofore existing. The laws of that state (Revised Laws of Minnesota, § 1987) provided:

"That any common carrier who violated the provisions of that section or willfully suffered any such unlawful act or omission, when no specific penalty is imposed therefor, 'if a natural person, shall be guilty of a gross misdemeanor, and shall be punished by a fine of not less than twenty-five hundred dollars, nor more than five thousand dollars for the first offense, and not less than five thousand dollars nor more than ten thousand dollars for each subsequent offense; and, if such carrier or warehouseman be a corporation, it shall forfeit to the state for the first offense not less than twenty-five hundred dollars nor more than five thousand dollars, and for each subsequent offense not less than five thousand dollars nor more than ten thousand dollars, to be recovered in a civil action'"

—which said statute covers disobedience to the orders of the commission. Soon after the creation of said commission, the Legislature of said state passed an act (Laws Minn. 1907, c. 97 [Gen. St. 1913, §§ 4288, 4289]) fixing two cents a mile as the maximum passenger rate to be charged by the railroads in that state. It was provided in that act that:

"Any railroad company, or any officer, agent, or representative thereof, who shall violate any provision of this act shall be guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding five thousand (5,000) dollars, or by imprisonment in the state prison for a period not exceeding five (5) years, or both such fine and imprisonment."

Section 6 of said act (Laws Minn. 1907, c. 232 [Gen. St. 1913, § 4303])—

"directed that every railroad company in the state should adopt and publish and put into effect the rates specified in the statute, and that every officer, director, traffic manager or agent or employé of such railroad company should cause the adoption, publication and use by such railroad company of rates not exceeding those specified in the act; 'and any officer, director or such agent or employé of any such railroad company who violates any of the provisions of this section, or who causes or counsels, advises or assists any such railroad company to violate any of the provisions of this section, shall be guilty of a misdemeanor, and may be prosecuted therefor in any county into which its railroad extends, and in which it has a station, and upon a conviction thereof be punished by imprisonment in the county jail for a period not exceeding ninety days.'"

In that case, as in the one at bar, it was contended that the penalty provisions of said laws attacked were violative of the fourteenth amendment of the Constitution of the United States. The Supreme Court in considering this question said:

"Another federal question is the alleged unconstitutionality of these acts because of the enormous penalties denounced for their violation, which prevent the railroad company, as alleged, or any of its servants or employés, from resorting to the courts for the purpose of determining the validity of such acts. The contention is urged by the complainants in the suit that the company is denied the equal protection of the laws and its property is liable to be taken without due process of law, because it is only allowed a hearing upon the claim of the unconstitutionality of the acts and orders in question, at the risk, if mistaken, of being subjected to such enormous penalties, resulting in the possible confiscation of its whole property, that rather than take such risks the company would obey the laws, although such obedience might also result in the end (though by a slower process) in such confiscation. * * * Coming to the inquiry regarding the alleged invalidity of these acts, we take up the contention that they are invalid on their face on account of the penalties. For disobedience to the freight act the officers, directors, agents and employés of the company are made guilty of a misdemeanor, and upon conviction each may be punished by imprisonment in the county jail for a period not exceeding 90 days. Each violation would be a separate offense, and, therefore, might result in imprisonment of the various agents of the company who would dare disobey for a term of ninety days for each offense. Disobedience to the passenger rate act renders the party guilty of a felony and subject to a fine not exceeding $5,000 or imprisonment in the state prison for a period not exceeding 5 years, or both fine and imprisonment. The sale of each ticket above the price permitted by the act would be a violation thereof. It would be difficult, if not impossible, for the company to obtain officers, agents, or employés willing to carry on its affairs, except in obedience to the act and orders in question. The company itself would also, in case of disobedience, be liable to the immense fines provided for in violating orders of the commission. The company, in order to test the validity of the acts, must find some agent or employé to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts (either state or federal) for the purpose of testing its validity. The officers and employés could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. The result would be a denial of any hearing to the company. The observations upon a similar question made by Justice Brewer in Cotting v. Kansas City Stockyards Company, 183 U. S. 79, 99, 100, 102 [22 Sup. Ct. 30, 46 L. Ed. 92] are very apt. At page 100 he stated: 'Do the laws secure to an individual an equal protection when he is allowed to come into court and make his claim or defense subject to the condition that upon a failure to make good that claim or defense the penalty for such failure either appropriates all his property or subjects him to extravagant and unreasonable loss?' Again, at page 102, he says: 'It is doubtless true that the state may impose penalties, such as will tend to compel obedience to its mandates by all, individuals or corporations, and if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the Legislature, in an effort to prevent an inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws.' The question was not decided in that case, as it went off on another ground. We have the same question now before us, only the penalties are more severe in the way of fines, to which is added, in the case of officers, agents, or employés of the company, the risk of imprisonment for years as a common felon. * * * We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, without regard to the question of the insufficiency of those rates."

See, also, Missouri Pacific Ry. Co. v. Tucker, 230 U. S. 240, 33 Sup. Ct. 961, 57 L. Ed. 1507; Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417; Standard Oil Co. v. Missouri, 224 U. S. 270, 32 Sup. Ct. 406, 56 L. Ed. 760, Ann. Cas. 1913D, 963; Bonbright et al. v. Geary et al. (D. C.) 210 Fed. 44.

On the authority of these cases and on principle we are of the opinion, and so decide, that said Act 90 of the First Legislature of the state of Arizona imposes such penalties and imprisonment as to practically deprive the complainant of the right to appeal to the court to determine the validity of the law and the orders of the corporation commission, and is therefore unconstitutional in that particular.

[3] 3. Complainants' contention that the order of the corporation commission is confiscatory presents a mixed question of law and fact. The question is: Are the rates in question so palpably unreasonable and unjust as to amount to a taking of complainants' property without compensation? If so, this court will grant relief; otherwise, the rates must stand. At the hearing before the corporation commission which was had the 11th day of December, 1913, complainants were represented by counsel, and given a fair and full opportunity to be heard, and to introduce testimony regarding the value of said water system, and the property used and useful in connection therewith; but complainants, relying on their contention that said corporation commission had no jurisdiction over complainants and said utility, failed to introduce any such testimony, and refused to recognize the validity of the investigation then being conducted. It is contended by the respondents herein that, as complainants did not offer any such evidence before the commission, therefore they ought not to be allowed to say now that the valuation placed upon said property for rate-making purposes was not a fair valuation. We cannot adopt this contention. This question arose in the case of San Joaquin Co. v. Stanislaus County, which went up to the Supreme Court of the United States from this (the Ninth) circuit, and in that case the Supreme Court said:

"It was suggested to be sure at the argument that it does not appear that the plaintiff offered any evidence as to water rights at the hearing before the supervisors, and therefore it ought not to be allowed to complain now that nothing was allowed for them. But this evidently is an afterthought. In general, a party may wait until a law is passed or regulation is made and then insist upon his constitutional rights." 233 U. S. 459, 34 Sup. Ct. 653, 58 L. Ed. 1041, and cases cited.

[4] While this is true, and while a person is not concluded by the failure to offer testimony, still it would seem but fair to the commission and to the judges, who are called upon to pass upon the justness and reasonableness of the rates upon an application for an injunction pendente lite, that they should at least furnish to the commission a full list of their property, and otherwise aid them in their efforts to fairly inventory and appraise the same. As an illustration, in this case it is not pretended that any mention whatever was made of the alleged water right during the investigation, and the commission was not even requested to include it in their estimate of the value of the property for rate-making purposes. As was said by the Supreme Court of the United States while discussing a similar case:

"If a company of this kind chooses to decline to observe an ordinance of this nature and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the Constitution of the United States." Knoxville v. Water Co., 212 U. S. 1, 16, 29 Sup. Ct. 148, 153 (53 L. Ed. 371).

The record in this case shows that prior to the 28th day of November, 1911, Ida A. Van Dyke and Cleve W. Van Dyke "organized a corporation under the laws of Arizona known as the Miami Townsite Company, which said townsite company purchased a tract of land for the purpose of establishing a town thereon, and caused said tract of land to be surveyed into lots, blocks, streets, and alleys, and established a townsite business; that said land so purchased by the said Miami Townsite Company is the same land upon which is now situated a part of the town of Miami in Gila county, state of Arizona; that in order to facilitate the establishment of said town, and to sell and dispose of lots of land therein, and to provide the purchasers of lots within said town with water, and to protect the inhabitants thereof against damage and loss by fire, the said I. A. Van Dyke, in connection with said townsite business, established and developed a water system known as the I. A. Van Dyke water system upon the land within the town of Miami and adjacent thereto, which said system is connected with the wells of water owned by said I. A. Van Dyke; that said system so established by the said I. A. Van Dyke was established, and is now being conducted by her, for the sole purpose of supplying purchasers of land of the Miami Townsite Company who might reside thereon, with water for domestic, commercial, and fire uses, and was not established for the purpose of supplying the public generally with water;" that said Ida A. Van Dyke has also acquired certain other property, which she alleges is used and useful in connection with the operation of said water system, consisting of 189.7 acres of land, 60 acres of which it is claimed constitute a water basin, and 129.7 acres of which constitute a watershed, and the aggregate value of which is $73,720; also certain strips of land from two to four feet in width in the said town of Miami, through and upon which the mains and lateral pipes of said water system are laid in Miami townsite, and the strips of land reserved for future use in the laying of mains and lateral pipes, of the alleged value of $43,884.34; also a water right of the alleged value of $20,000. The first work was done on this water system in the year 1909. The water in the vicinity of Miami is developed by means of sinking wells and pumping. The testimony shows that the supply is limited, and that it has been necessary to sink and develop several wells before an adequate supply for the needs of said town could be developed. As the town grew, 'said water system was enlarged, and the water mains and laterals were extended.

The opinion and order of the corporation commission was based upon the evidence introduced at said hearing, including an inventory and appraisal of the property of the water system made by the engineer of the commission, and said order recites that "no comparisons of value can be made, because it is impossible to develop the book value (of the plant) or the historical value from the company's (meaning the

complainants') records." No balance sheet had ever been rendered, and the books and accounts of the water company had not been balanced since December, 1910. The commission then proceeded from the data available to place a valuation upon the water plant and the several units thereof for rate-making purposes at the sum of $40,105. In arriving at these figures the commission allowed 3½ per cent. for depreciation, and $3,500 for the working capital.

The testimony further shows that the commission found that the office force, in addition to handling the accounts of the water company, also handled the office work of the Miami Telephone Company, Miami Townsite Company, and Miami Electric Light Company, and estimated that, of the total expense of doing this work, $1,251.44 should be charged to the water system. Thereupon the commission by its order canceled the then existing rates, and in lieu thereof installed the rates now in question, which the commission estimated would net the complainants $4,010.50 as interest and as a fair return upon all of the water company's tangible and intangible assets represented by the property on hand October 1, 1913.

As above stated, it is complained that the corporation commission failed to include in the property of the said water system, or consider or allow, a large tract of land containing about 189 acres. It is true that the commission did not allow anything for this property, and their reasons therefor are stated in their opinion, as follows:

"The contention of the company that the hills forming the banks of the main stream and small tributary gulches should be included in the valuation, on the ground that such hills divert water into the main channel, is not considered by this commission. No effort of the company could prevent water being so diverted, and it seems that the snowbanks of the Pinal Mountains or the clouds could attain the same elements of value. The company offered no direct evidence as to the value of real estate, and the testimony of the witness Mackey appears not to have been controverted."

The company alleges that this tract of land was of the value of more than $38,400. In the affidavits submitted by complainants the same is valued at $73,720. It will be observed from an examination of these affidavits, especially those of L. F. Fletcher and A. Reid, both of whom are dealers in real estate, and both of whom fixed the value at exactly the same figure, that they did not place a value upon this land for water purposes, or show how or in what manner it was worth $73,720 when used in connection with said water system. They simply valued the land itself, regardless of the use to which it had been or might be put; in other words, they gave the total value of the land, and in arriving at that value they stated:

"I arrived at my estimate of said valuation and base the same upon the sale of real estate of the same or similar character in the vicinity of said land."

So far as the records show, this land might be underlaid with valuable mineral deposits, or it might be valuable for residential or other purposes, and it seems absurd to ask that they be allowed to require the consumers of water in the townsite of Miami to pay a return upon the actual value of this land, independent of its value when used as a

part of, or in connection with, said water system, and we do not find anything in the record·which shows its value when so used, if it has ever been so used. It was stated in argument, and not denied, that the title to the land was acquired under the mineral laws of the United States. Suppose the complainants had gone back to the top of the Pinal Mountains, and acquired twice or thrice the area now owned by them; would it be contended that because these vast areas form a part of the watershed, and the water finds its way ultimately into the complainants' wells, that an allowance should be made for all such property? We think not, and believe that the corporation commission did not err when it refused to make an allowance for this property.

We are likewise of the opinion that the commission properly disallowed the claim for $20,000 for a water right. The affidavits submitted do not give a definite description of the alleged water right, and on the evidence submitted we are not able to determine whether in fact the complainants have made a legal appropriation of either underground or flood waters.

It is next claimed that complainants are entitled to an allowance of $43,884.34 on certain strips of land in Miami from 2 to 4 feet wide through and upon which the water mains and lateral pipes of the system are laid, and other strips of like width so located and reserved for future use in the laying of pipes. These strips seem to have been acquired by Ida A. Van Dyke by purchase from the townsite company. Pretermitting any consideration of the right of that company to thus dispose of any part of the streets in Miami, it is certainly true that these strips could be of value, so far as this case is concerned, only as a means of extending the pipes. It could have no value as residence or business property, for it was in the streets, and subject to the servitude of public passage, and no structure could be placed on it which would interfere with the right of the public. We think the corporation commission committed no error in rejecting such claim. As shown by the affidavits of witnesses R. G. Thomas and L. F. Fletcher, these values were secured by a careful tabulation made as follows:

"The rights of way for the water mains are four feet in width, the rights of way for the laterals are two feet in width, and the value of the rights of way were determined upon the basis of the value of abutting property, the amount of value of the abutting property being determined in all instances upon the basis of a valuation placed upon said property by the county assessor for the year 1914. This method was used in all parts of the townsite, with the exception of a proportionately small area in the western part of the townsite. In this western portion the assessor had failed to place a valuation upon this section in lots and blocks, but included the valuation with other property. Upon this portion I made my own estimates of value, based upon the assessor's valuation of other property. In securing the unit of value, the number of square feet of the abutting property was determined, and the assessed valuation placed thereon by the assessor was divided by the number of square feet area. This unit value was then used as a factor in finding the value of the abutting right of way, by multiplying the number of square feet in the abutting right of way by the unit value. The areas of the lots and the areas of the rights of way were determined by Engineer Thomas, and the values of the property determined by the county assessor and myself."

According to this method of arriving at the valuation to be placed on said rights of way, etc., should the property along any of the streets in Miami ever reach the price of $1,000 per front foot, the value of these strips of land or rights of way would increase proportionately, and the consumers of water in the town of Miami would naturally have to pay for their water such rates as would bring a fair return upon the increased valuation.

It is also claimed that the commission failed to allow anything for a spur track, of the value of $500, and several other items of small value; but as these items are too small to produce any material effect in the amount of the gross aggregate, this would not affect the question of the reasonableness of the rates fixed and to be charged, and we think it unnecessary to go into details regarding them.

Complainants' counsel cite the case of Bonbright et al. v. Geary et al., supra, in which this court said:

"The inquiry will also be aided by another rule, that if the valuation of any one of the necessary elements of the public service plant is fixed by the rate-making authorities at an amount unjustly and unreasonably low in a substantial amount, or if the value of an element of substantial value used and useful in maintaining or operating such a plant is entirely omitted by the rate-fixing authority, such unreasonable and unjust valuation or omission of valuation is the taking of private property for a public use without just compensation."

We have carefully examined the evidence submitted, and we do not find therefrom that the corporation commission omitted from its estimate of the valuation placed upon the property for rate-making purposes any element of substantial value which should have been included therein.

[5] 4. The next and perhaps the most important question for consideration is whether the complainant Ida A. Van Dyke, individual owner of a water plant, is included within the provisions of the Constitution and laws of the state of Arizona providing for the regulation of charges of public utilities such as are involved in this case. We think she is. We are also of the opinion that the corporation commission was clearly within its jurisdiction in prescribing rates and charges to be made and collected by said complainant Ida A. Van Dyke for water furnished to the inhabitants of the town of Miami. The statute in question uses this language:

"The term 'water corporation,' when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating, or managing any water system for compensation within this state."

Manifestly complainant is within this definition. But it is insisted that the Constitution of the state of Arizona has defined what is a corporation, and that such definition cannot be extended by the Legislature, nor can the Legislature declare that corporations may consist of members not specifically named in the Constitution. The provisions of the Constitution which are said to be controlling are the following:

Article 14, § 1, which is as follows:

"The term 'corporation,' as used in this article, shall be construed to include all associations and joint-stock companies having any powers or priv-

ileges of corporations not possessed by individuals or copartnerships, and corporations shall have the right to sue and shall be subject to be sued, in all courts, in like cases as natural persons."

Article 15, § 2, provides:

"All corporations other than municipal engaged in carrying persons or property for hire, or in furnishing gas, oil, or electricity for light, fuel, or power, or in furnishing water for irrigation, fire protection, or other public purposes, * * * shall be deemed public service corporations."

And article 15, § 3, provides:

"The corporation commission shall have full power to, and shall, prescribe just and reasonable classifications to be used, and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the state. * * *"

By subdivision (Z) of said Act 90, known as the Public Service Corporation Act, the term "public service corporation" is defined as including every *water corporation.* There is nothing in the Constitution which forbids the Legislature from declaring that a person who engages in furnishing water for compensation to a town or city, or to the inhabitants thereof, shall not be considered, called, and treated as a corporation. There is nothing conflicting in the provisions of the Constitution and the statute. This is not a case of an expansion of a constitutional provision by the Legislature, but a definition by the Legislature which is consistent with the provisions of the Constitution. There is, moreover, another provision of the Constitution which has an important bearing on this case. Article 15, § 6, is as follows:

"The lawmaking power may enlarge the powers and extend the duties of the corporation commission, and may prescribe rules and regulations to govern proceedings instituted by and before it; but, until such rules and regulations are provided by law, the commission may make rules and regulations to govern such proceedings."

It is contended that the Legislature is not authorized to define the terms used in the Constitution. Why not? If such a definition is not inconsistent with the plain purpose and spirit of the other provisions of the Constitution, we think it may. In our opinion it is perfectly consistent and competent for the Legislature to provide that a water corporation is a public service corporation within the meaning of the law. This construction of the Constitution and the statutes is supported by well-defined rules of construction. Some of these rules are stated in the opinions of the Supreme Court of the United States as follows:

"There is a presumption against a construction which would render a statute ineffective or inefficient, or which would cause grave public injury or even inconvenience." Bird v. United States, 187 U. S. 118, 124, 23 Sup. Ct. 42, 44 (47 L. Ed. 100).

"To adopt such a construction would put a stop to the ordinary business of life. The language of the act, if construed literally, evidently leads to an absurd result. If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed." Holy

Trinity Church v. United States, 143 U. S. 457, 460, 12 Sup. Ct. 511, 512 (36 L. Ed. 226).

See, also, United States v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278.

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter." Holy Trinity Church v. United States, 143 U. S. 457-461, 12 Sup. Ct. 511, 512 (36 L. Ed. 226).

"The duty of the court, being satisfied of the intention of the Legislature, clearly expressed in a constitutional enactment, is to give effect to that intention, and not to defeat it by adhering too rigidly to the mere letter of the statute, or to technical rules of construction." Oates v. National Bank, 100 U. S. 239, 244, 25 L. Ed. 580.

"And it is a general rule, without exception, in construing statutes, that effect must be given to all their provisions if such a construction is consistent with the general purposes of the act and the provisions are not necessarily conflicting. All acts of the Legislature should be so construed, if practicable, that one section will not defeat or destroy another, but explain and support it. When a provision admits of more than one construction, that one will be adopted which best serves to carry out the purposes of the act." Bernier v. Bernier, 147 U. S. 242, 246, 13 Sup. Ct. 244, 245 (37 L. Ed. 152).

Black, in discussing this question, quotes Judge Story as follows:

"Every word employed in the Constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtilties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human-life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." Black on Interpretation of Laws (2d Ed.) p. 33.

"A definition incorporated in a statute is as much a part of the act as any other portion. It is imperative. 'The right of the Legislature to prescribe the legal definitions of its own language must be conceded.' 'The right of the Legislature enacting a law to say in the body of the act what the language used shall, as there used, mean, and what shall be the legal effect and operation of the law, is undoubted.'" Id. pp. 269, 270.

"A statute should therefore be read with reference to its leading idea, and its general purpose and intention should be gathered from the whole act, and this predominant purpose will prevail over the literal import of particular terms or clauses, if plainly apparent, operating as a limitation upon some and as a reason for expanding the signification of others, so that the interpretation may accord with the spirit of the entire act, and so that the policy and object of the statute as a whole may be made effectual and operative to the widest possible extent. Moreover, the reading of the statute as a whole will often afford the means of correcting apparent mistakes in the wording of particular parts." Id. pp. 320, 321.

The authorities sustaining this construction of the statute might be multiplied, but we deem the above sufficient. It seems to us to be giving a very narrow and technical construction to the provisions of the Constitution and the statute to say that it would not include persons, because such a definition is found in the statute, but is absent from the Constitution. It would seem to render the Constitution in-

effective, and would, to a great extent, defeat the beneficial purposes of the statute and the practical ends which it is intended to accomplish. There would be no difficulty whatever in a corporation transferring its property to an individual, and thus destroy the jurisdiction of the corporation commission. Such a construction would therefore result in defeating the statute entirely until the Constitution could be amended to conform to such a view. We are therefore of the opinion that under the Constitution and the statutes passed in execution of it the complainant Ida A. Van Dyke is subject to the statute and the jurisdiction of the corporation commission.

[6] 5. It is also contended by complainants that that portion of said act which purports to confer power upon said corporation commission to investigate individuals engaged in public service enterprises is unconstitutional and void, because the subject of the investigation of individuals contained in the body of the act is not mentioned in the title. In support of this contention, complainants cite section 13, subdivision 2, article 4, of the Constitution of the state of Arizona, which is as follows:

"Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

The opinion formed and expressed by the court on the question next preceding this one, and the authorities cited in support thereof, might be deemed a sufficient answer to this contention; however, we will consider it briefly:

The question is: Does this act violate article 4 of the Constitution of the state of Arizona? Does it embrace more than "one subject *and matters properly connected therewith"?* We think not. A similar provision is contained in the Constitutions of most of the states of the Union, and has been repeatedly construed by the state courts, as well as by the Supreme Court of the United States. We need cite only a few of the cases on the subject.

In the case of Montclair v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. 391, 27 L. Ed. 431, the latter court, in construing a similar provision in the Constitution of the state of New Jersey, said:

"The purpose of this constitutional provision was declared by the Supreme Court of New Jersey in State v. Town of Union, 33 N. J. Law, 350, to be 'to prevent surprise upon legislators by the passage of bills, the object of which is not indicated by their titles, and *also to prevent the combination of two or more distinct and unconnected matters in the same bill.'* Further, said the court: 'It is not intended to prohibit the uniting in one bill of any number of provisions having one general object fairly indicated by its title. The unity of the object must be sought in the end which the legislative act proposes to accomplish. The degree of particularity which must be used in the title of an act rests in legislative discretion, and is not defined by the Constitution. There are many cases where the object might with great propriety be more specifically stated, yet the generality of the title will not be fatal to the act, if by fair intendment it can be connected with it.' * * * And the doctrines of the New Jersey court are in harmony with decisions of the highest courts of other states when construing similar provisions in the Constitutions of their respective states. See authorities cited in Cooley's Const. Lim. 146, note 1."

A like provision of the Constitution of the state of Illinois was considered by the Supreme Court of the United States in the case of Jonesboro City v. Cairo & St. Louis R. R. Co., 110 U. S. 192, 4 Sup. Ct. 67, 28 L. Ed. 116. In that case the Supreme Court quoted with approval an opinion of the Supreme Court of Illinois, as follows:

"It was held in Johnson v. People, 83 Ill. 431, that the Constitution 'does not require that the subject of the bill must be specifically and exactly expressed in the title; hence we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required.' People v. Lowenthal, 93 Ill. 191."

That such a constitutional requirement should be construed liberally is well settled:

"In most of the states, the Constitution provides that no act of the Legislature shall embrace more than one subject, and that such subject shall be expressed in the title of the act. This provision is mandatory, and if it is disregarded, the whole statute, or any separable part of it not embraced within the title, will be rejected as unconstitutional. *But this requirement is construed liberally, and the courts are unwilling to defeat or embarrass legislation by putting too strained or technical a construction upon this clause of the Constitution.*" Black's Constitutional Law, § 107, p. 286.

"In regard to the degree of particularity required in the title of a statute, it is the accepted doctrine that it is sufficient if the title describes, with adequate clearness, the *general purpose and scope of the act.* It need not amount to an index or epitome of the statute, nor is it necessary that the title should set forth the modes, means, and instrumentalities provided in the law for its administration and enforcement. For example, a law incorporating a city, or one granting franchises to a business corporation, or one relating to the general subject of elections, or one regulating the manufacture and sale of intoxicating liquors, or one providing a general system of taxation for the state, will contain a great number of detailed and specific provisions. *But if they all relate to the general subject-matter* of the act, and *are all germane to its general purpose*, it is not necessary that each should be mentioned in the title. In all such cases, a general and comprehensive title will meet the requirement of the Constitution." Id. p. 286, 287.

All that is required of the title to a statute is that it cover the general matter or subject of its provisions. To require every detail of its provisions to appear in the title of an act would be to enlarge the title into an amplified synopsis, which obviously is not within its province. While it is true that this act contains a great number of detailed provisions, still we think that they are all germane to its general purpose. and that the manifest intent of the Legislature and the construction of the words of the act are in favor of the law; that the title of the act embraces "but one subject and matters properly connected therewith."

"Every statute consists of the letter and the spirit, and by comparing the different parts with each other, from the title to the last sentence, it is found to be its own best exposition." 4 Inst. 424.

[7] 6. The order made and entered by the corporation commission on the 23d day of July, 1914, directing the complainant Ida A. Van Dyke to "connect her water system in the town of Miami with the consumers in the Live Oak addition to said town, and that she serve the consumers of said Live Oak addition with water," was, under the facts of the case, in excess of its powers, and complainant is entitled to have an injunction against the enforcement of such order, especially

in view of the following finding made by said commission immediately after it had made a thorough investigation of said water system and prescribed rates to be charged for water by the owners of said system:

"The adequacy of the water supply has been questioned. We are of the opinion that the record would not justify a definite statement on this subject. It is true that the lower well failed for cause unknown, but both wells were supplying sufficient water through a period of drought, demonstrating the adequacy of the supply."

As above stated, the record herein shows that the water system was established and is now being conducted for the sole purpose of supplying purchasers of land of the Miami Townsite Company, who might reside thereon, with water for domestic and commercial use and for fire protection, and it would seem manifestly unjust to the owners of said water system, as well as to the inhabitants of said townsite, to require the extension of said system and the furnishing of water to the inhabitants of said Live Oak addition, or any other addition of said townsite. The facts in the case of Del Mar Water, Light, & Power Co. v. Eshleman, 167 Cal. 666, 681, 140 Pac. 595–597, are somewhat similar to the facts of this case, and in that case the court said:

"In this state, where the territory needing water is vastly greater than the available water will supply, it is obvious that the district to be served from any source, or by any water service company, must be limited in extent. Indeed, the same is substantially true of a water service anywhere. The supply is always limited, and the territory to which it is to be served must likewise be limited; otherwise the amount served to each person might, by constantly increasing demands, be made so small that it would be of no use to any one. There can be no doubt, therefore, that the owner of a water supply may make a limited dedication of it to public use, confining the use to such territory as he sees fit. * * * Accordingly, our decisions have recognized and have repeatedly declared the right of a water company to make such limited dedication, and to decline to furnish its water to persons not within the area it has undertaken to serve. Leavitt v. Lassen Irr. Co., 157 Cal. 82, 106 Pac. 404, 29 L. R. A. (N. S.) 213; Thayer v. Cal. Dev. Co., 164 Cal. 128, 128 Pac. 21; Price v. Riverside, 56 Cal. 433; Hildreth v. Montecito, 139 Cal. 29, 72 Pac. 395; 2 Wiel on Water Rights (3d Ed.) par. 1281; Lewis, Em. Dom. (3d Ed.) pars. 254, 313."

We are accordingly of opinion that a temporary injunction should issue forbidding each and all of the respondents to enforce the fines and penalties provided by the said Act 90 pending this suit. The evidence submitted by the complainants does not afford this court a satisfactory basis on which to adjudicate the question of the value of the property used as a water plant, and therefore the court cannot say that the rates prescribed by the corporation commission are confiscatory, and there is no basis on which an order could be made declaring them illegal. If hereafter it shall appear that, under actual operation of the plant under these rates, the return allowed by such corporation commission operates as a confiscation of the property of complainant Ida A. Van Dyke, she may, at the expiration of one year, again present her evidence to the court and obtain appropriate relief on the facts then presented.

The court will retain jurisdiction of the case, with permission to complainant Ida A. Van Dyke, if so advised, after the expiration of

one year, to renew her application for an injunction against the rates established by the corporation commission as confiscatory. In the meantime the rates established will remain in force.

An order will be entered in accordance with this opinion.